Reversed and Rendered in Part and Remanded in Part and Opinion filed
December 9, 2003









Reversed and Rendered in Part and Remanded in Part and Opinion filed
December 9, 2003.

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-01-00976-CV

____________

 

CLEAR LAKE CITY WATER AUTHORITY, Appellant/Cross-Appellee

 

V.

 

KIRBY LAKE DEVELOPMENT, LTD.,
MITER DEVELOPMENT COMPANY, LLC, TAYLOR LAKE, LTD., AND UNIVERSITY DEVELOPMENT,
INC., Appellees/Cross-Appellants

 



 

On Appeal from the 113th
District Court

Harris County, Texas

Trial Court Cause No. 98-58185

 



 

O P I N I O N








Appellant Clear Lake City Water Authority (Athe Authority@) appeals a judgment awarding
actual damages for breach of four contracts totaling $1,696,171, attorney=s fees, pre-and post-judgment
interest, and costs in favor of appellees.  The judgment also declared that the Authority
was obligated, under its contracts with appellees, to
purchase appellees= sewer, water, and drainage
facilities.  Additionally, the Authority
board of directors was ordered to levy, assess, and collect taxes or
assessments to pay the judgment.  For the
reasons stated below, we reverse and render the claims of three of the
plaintiffs, and reverse and remand the claims of the remaining plaintiff.

FACTUAL BACKGROUND

The Authority is a conservation and reclamation district
created by the Texas Legislature in 1963 to provide water, sewer, and drainage
facilities to the Clear Lake area. 
Between 1993 and 1998, the Authority entered into contracts with appellees Kirby Lake Development, Ltd. (AKirby Lake@), Miter Development Company, LLC (AMiter@), Taylor Lake Ltd. (ATaylor Lake@), and University Development, Inc. (AUniversity@), to pay a portion of the costs
incurred in constructing water and sewer facilities on properties appellees developed within the Authority.[1]  Under each contract, entitled ASales Agreement and Lease of
Facilities,@ the developer agreed to lease the
facilities to the Authority at no charge until the Authority purchased them,
and the Authority agreed to reimburse the developer 70% of the costs of
constructing the facilities.  All of the
contracts except University=s contract contained substantially the same payment language.

The contracts contemplated that the primary source of funds for
developer reimbursements would be the proceeds from bond sales.  In 1989, the voters within the Authority had
authorized the sale of $43.6 million in bonds for the purpose of reimbursing
developers and paying for the installation and upkeep of the Authority=s water, sewer, and drainage
system.  The Authority subsequently
reimbursed University for the facilities constructed in two of the four
sections in its development with the proceeds of one of the bond sales.  By 1997, however, all of the bonds authorized
in 1989 had been sold, so the Authority decided to call another bond election
to obtain voter approval for the sale of additional bonds to be used for system
needs and to pay for reimbursements to developers, including University and the
other appellees.








On March 12, 1998, the Authority voted to call a bond
election for May 2, 1998.  It also voted
to submit its bond proposals in three different propositions.  Proposition 1 requested
voter authorization for bonds for system needs and current developer
reimbursements, including reimbursements to appellees.  Propositions 2 and 3 were for future
developer reimbursements.  The Authority
also approved DEV-90, which put into written policy the practice of requiring
developers to pay 100% of the construction costs for facilities in their
developments up front, and reimbursing them 70% of the costs from
voter-approved bond funds.  

Gayle Yoder, then a member of the board of directors of the
Authority and later its President, became concerned that voters should be given
a choice about authorizing bonds for developer reimbursements.  She favored separating the bond propositions
to distinguish between what she termed the Anecessities@ of keeping the system running and
developer Asubsidies.@ 
She objected to the inclusion of developer reimbursements in Proposition
1, and publicly took a position against the bond election as structured.  Her opinion became the subject of local
newspaper articles, and at one point, she distributed a memorandum detailing
her opposition in her neighborhood of Taylor Lake Village.  The memorandum reflected that it was from AGayle I. Yoder, Director, Clear Lake City Water Authority.@

The May 2 election also included several directors= positions.  Two incumbent directors were challenged by
Don Johnson and Elliott Cooper, who both ran on an anti-bond platform.  They prepared AVote No Bond$@ campaign signs, some of which Yoder
distributed.  The signs also stated AStop using taxes to subsidize developers@ and ACLC Water Authority.@[2] 
Johnson posted a number of signs around the Authority=s building.

All the propositions submitted to the voters in the May 2
election failed, and Johnson and Cooper defeated the incumbent directors.  Of the three voting precincts in the Authority,
the precinct that included Yoder=s neighborhood of Taylor Lake Village
(where she had distributed her memo to residents) defeated the bonds by the
widest margin.








Because Proposition 1 failed and the Authority still required
funds for maintenance and expansion of its system, the Authority decided to
hold another bond election in October 1998. 
This time, system needs were separated from developer reimbursements
into two propositions.  As before, the AVote No Bond$@ signs reappeared around the
Authority building and elsewhere, this time prompting a letter from the
Authority=s counsel requesting they be taken
down because they could be read to imply that the Authority was taking a
position against the bonds.  

Ultimately, Proposition 1, requesting bonds for system needs,
passed.  However, Proposition 2,
requesting bonds for funds to reimburse developers_including appellees_failed.  One
month later, in November 1998, the Authority changed its DEV-90 policy on
reimbursing developers to require developers to pay 100% of the cost of water,
sewer, and drainage facilities they install in new subdivisions.  

When appellees were not paid for
the facilities, they brought suit against the Authority alleging breach of
contract, quantum meruit, and an unconstitutional
taking based on the Authority=s use of the facilities to provide water, sewer, and drainage
services to customers in appellees= developments.  Appellees also
sought a writ of mandamus and a declaratory judgment that the Authority was
obligated to fulfill its obligation to purchase the facilities Aas soon as possible@ with funds on hand or with the
issuance of revenue bonds, which would not require voter approval.  Appellees pleaded
for attorney=s fees and costs based on sections
37.009 and 38.001 of the Texas Civil Practice and Remedies Code, and requested
a jury trial.








At trial, during questioning from appellees= attorney, Yoder took the position
that the revised DEV-90 policy requiring developers to pay 100% of the cost of
constructing water, sewer, and drainage facilities within their developments
applied to appellees, even though it was not in
effect when they signed their contracts, and appellees= agreements call for the Authority to
pay 70% of the costs.  However, she also
stated that the full board had not voted on whether to apply the new policy to appellees.  Don
Johnson, when asked whether he was opposed to spending any money the Authority
has on hand to reimburse appellees, stated that the
Authority Ahas evolved beyond the point of
paying any kind of developer subsidies. 
I think we are past that.@ 
Johnson also testified that he thought the Authority could just continue
the lease arrangement indefinitely, so it would not have to pay for the
facilities and taxpayers would not be charged.

The jury found breach of contract and awarded Kirby Lake
$748,675.00, Miter $74,252.00, Taylor Lake $510,000.00, and University
$363,244.00.[3]  The jury also found that appellees
were entitled to recover in quantum meruit and
awarded the same amount of damages.  The
issue of attorney=s fees was tried to the court.  Appellees elected
to recover for breach of contract, and the trial court entered judgment for
$1,696,171.00 in actual damages, $442,398.56 in prejudgment interest, and
$362,014.75 in attorney=s fees, plus post-judgment interest and costs.  The trial court also declared that the
Authority was obligated to purchase the facilities and ordered it to take any
and all actions required to purchase them. 
The trial court further ordered the Authority, pursuant to Texas Water
Code section 49.066(b), to levy, assess, and collect taxes or assessments to
pay the judgment.  The court denied the
Authority=s post-verdict motions, including a
motion for directed verdict and judgment notwithstanding the verdict.  This appeal followed.

ISSUES ON APPEAL

On appeal, the Authority raises seventeen issues (not including
subparts) that can be grouped in the following broad categories: (1) contract
construction; (2) charge error; (3) attorney fees; (4) pre- and post-judgment
interest; and (5) quantum meruit.  By cross-appeal, the appellees
contend the trial court erred in granting a directed verdict on their takings
claim.  Our disposition of the Authority=s contract construction and charge
error issues make it unnecessary for us to address its remaining issues.  We will then take up the appellees= alternative grounds for recovery
based on their quantum meruit claim and the trial
court=s declaratory judgment.  Lastly, we will address appellees= cross-point that the trial court
erred in granting a directed verdict on their takings claim.








I.        The Authority=s Issues

A.      The
Construction of the Contracts

The Authority contends the payment provisions of the
contracts were unambiguous and the Authority did not breach those
provisions.  In response, appellees do not directly address whether the contracts
were ambiguous.  Instead, they take aim
at specific contract language and assert that, as they construe the language,
the Authority breached the contracts in several ways.  Because the parties= arguments regarding the contract
language and the facts are often at cross-purposes, we will incorporate into
our discussion as much of the parties= arguments as required to resolve the
issues raised.

1.         Were the
Contracts Unambiguous?

The trial court determined the contracts were ambiguous and
instructed the jury to interpret them. 
However, the trial court did not include special issues asking the jury
to interpret specific provisions, so we do not know how the jury interpreted
the contracts or on what basis they found breach of contract.  The Authority contends the payment  provisions of the contracts
unambiguously provide that the developers were to be paid only out of legally
available and allocated voter-approved bond funds, and while the Authority
could use funds from other sources to pay the developers, it was not obligated
to do so.  In contrast, appellees contend the Authority agreed to pay Aas soon as possible@ from any available source, including
revenue bonds, which do not require voter approval.[4]  The payment provisions of all the contracts
at issue are similarly worded, with the exception of the University contract,
which is discussed separately. 








We hold that the Authority is correct with regard to three
of the four contracts at issue: the Kirby Lake, Miter, and 1994 Taylor Lake
contracts.  Accordingly, we reverse and render
judgment in favor of the Authority as to those contracts. With regard to the University
contract, we find that it is ambiguous. 
However, as discussed in section I.B. below, charge error requires that
University=s claims be remanded for new trial.

(a)       The
applicable law

The primary concern of a court in construing a written
contract is to ascertain the true intent of the parties as expressed in the
instrument.  Lenape Res. Corp. v.
Tennessee Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996); Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983).  To achieve this objective, we examine and
consider the entire writing in an effort to harmonize and give effect to all
the provisions of the contract so that none will be rendered meaningless.  Coker, 650 S.W.2d at
393.  We construe a contract from
a utilitarian standpoint, bearing in mind the particular business activity
sought to be served.  Lenape
Res., 925 S.W.2d at 574.

If a written contract is so worded that it can be given a
definite or certain legal meaning, then it is not ambiguous and it can be
construed as a matter of law.  Wal-Mart Stores, Inc. v. Sturges,
52 S.W.3d 711, 728 (Tex. 2001); Lenape Res.,
925 S.W.2d at 574.  Parol evidence is not admissible for the purpose of
creating an ambiguity.  Nat=l Union Fire Ins. Co. of Pittsburgh,
Pennsylvania, v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).  However, if the language of a contract is
subject to two or more reasonable interpretations, it is ambiguous.  Id.; see also Lenape
Res., 925 S.W.2d at 574. 

Whether a contract is ambiguous is a question of law for the
court to decide by looking at the contract as a whole in light of the
circumstances present at the time the contract was executed.  Nat=l Union Fire Ins. Co., 907 S.W.2d at 520; see also
Coker, 650 S.W.2d at 394.  Only when
a contract is first determined to be ambiguous may the courts consider the
parties= interpretation and admit extraneous
evidence to determine the true meaning of the instrument.  Columbia Gas
Transmission Corp. v. New Ulm
Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).








An ambiguity does not arise simply because the parties
advance conflicting interpretations of the contract.  Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994); Sun
Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726,
727 (Tex. 1981).  For an ambiguity
to exist, both interpretations must be reasonable.  Nat=l Union Fire Ins. Co., 907 S.W.2d at 520; see also Glover
v. Nat=l Ins. Underwriters, 545 S.W.2d 755, 761 (Tex.
1977).  Thus, the appellate court must
decide whether there is more than one reasonable interpretation of the contract
such that a fact issue was created concerning the parties= intent.  Columbia Gas Transmission, 940 S.W.2d at 589.

(b)       The Kirby
Lake, Miter, and 1994 Taylor Lake contracts

The first two Awhereas clauses@ of the Kirby Lake, Miter, and 1994
Taylor Lake contracts are identical:

WHEREAS, the Authority is authorized to provide, among
other things, water supply, waste disposal and drainage facilities to the land
within its boundaries;

WHEREAS,
the Developer is developing land within the Authority and desires that water
supply, waste disposal, and drainage facilities be provided to such land prior
to the time at which the Authority can obtain voter approval and pay for the
construction or acquisition of such facilities with the proceeds of its bonds;
. . . . 

The three contracts also contain substantially the same
payment provision:








PURCHASE AND
ASSIGNMENT.  Subject to other terms and provisions hereof,
the Developer agrees to sell and the Authority agrees to purchase all completed
portions of the Facilities . . . as soon as possible, but not more than 30 days
after receipt of bond proceeds legally available and allocated by the Authority
for payment therefore, in consideration of the purchase price defined in the
following Section.  It is expressly
acknowledged and agreed by the parties hereto, that the Authority has no
existing voter authorization to issue any bonds to pay for the cost of the
Facilities, and does not anticipate that funds will be available for such costs
without a voter approved bond sale for such purchase.  The Authority intends to call a bond election
in the near future, but is not obligated to do so, and the Authority cannot
predict when, if ever, such an election and bond sale will occur, or when, if
ever, the Authority will have other funds available and allocated for the
purchase of the Facilities.  The
Authority shall have the right to purchase the Facilities with funds available
from a source other than a bond sale for such purpose, but shall have no
obligation to do so.  The Authority does
agree, however, that it shall include in any bond election it does hold
subsequent to the effective date of this Agreement bond authorization in an
amount sufficient to pay the purchase price of the Facilities.  The Authority further agrees that it shall
include purchase of the Facilities in any bond issue sold subsequent to any
such election.[5]

We have carefully reviewed the contracts in their entirety,
and conclude that the language of the above provisions, as well as the
remainder of the contracts, demonstrate that these contracts unambiguously
require the Authority to reimburse appellees only with
voter-approved bond funds that are legally available and allocated for that
purpose.  While the Authority obligated
itself to purchase the completed facilities Aas soon as possible,@ that requirement did not arise until
after the Authority received the proceeds of voter-approved bond funds.  That the bond funds were to be voter-approved
bond funds, as opposed to other types of bonds or funds, is also evident in the
payment provision: AIt is expressly acknowledged and agreed by the parties
hereto, that the Authority has no existing voter authorization to issue any
bonds to pay for the cost of the Facilities, and does not anticipate that funds
will be available for such costs without a voter approved bond sale for such
purchase.@  This statement, in the context of the
entire provision, and in conjunction with other sections of the contracts,
unequivocally indicates that the only funds the Authority was required to use
to purchase the facilities was voter-approved bond funds.  This conclusion is confirmed by the explicit
language that the Authority could, but was not obligated to, use other sources
of payment: AThe Authority shall have the right to
purchase the Facilities with funds available from a source other than a bond
sale for such purpose, but shall have no obligation to do so.@  Additionally, there is no obligation
on the Authority to ensure that a bond election occurs, or that the voters give
their approval: AThe Authority cannot predict when, if ever, such an election
and bond sale will occur, or when, if ever, the Authority will have other funds
available and allocated for the purchase of the Facilities.@ 









Appellees argue that the payment provision
constitutes the Authority=s promise to pay for the facilities, and voter approval to
sell bonds is not a condition precedent that excuses the Authority=s obligation to pay.  A condition precedent may be either a condition
to the formation of a contract or to an obligation to perform an existing
agreement.  Hohenberg Bros. Co. v.
George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976).  Conditions precedent to an obligation to
perform are those acts or events, which occur subsequently to the making of a
contract, that must occur before there is a right to immediate performance and
before there is a breach of contractual duty. 
Id.  However, when the
intent of the parties is doubtful or when a condition would impose an absurd or
impossible result, then the agreement will be interpreted as creating a
covenant rather than a condition.  Id.  Because of their harshness in operation,
conditions are not favorites of the law. 
Criswell v. European Crossroads Shopping Ctr., Ltd.,
792 S.W.2d 945, 948 (Tex. 1990). 
Thus, in construing a contract, forfeiture by finding a condition
precedent is to be avoided when another reasonable reading of the contract is
possible.  Id.  

We reject appellees= contention that the receipt of
voter-approved bond funds is not a condition precedent, because the payment
provision of the contracts unambiguously provides that the Authority=s obligation to pay is expressly
conditioned upon the receipt of voter-approved bond funds.  See McWilliams v. Gilbert, 715 S.W.2d
761, 763B64 (Tex. App.CHouston [1st Dist.] 1986, no writ)
(holding that indemnity agreement unambiguously restricted general partners= reimbursement from partner to
designated specific source); see also City of Seymour v. Municipal
Acceptance Corp., 96 S.W.2d 814, 816B17 (Tex. Civ.
App.CDallas 1936, writ dism=d by agreement) (holding that
contract with city limiting source of payment to net revenues of light plant
created a condition precedent to city=s liability).  To construe the payment provisions another
way would be contrary to the plain language of the contracts.








Moreover, the failure of the condition precedent at a given
time does not result in a forfeiture, only a delay in
payment.  Nowhere in the contracts does
it provide that the failure to obtain voter approval forfeits appellees= right to receive payment for their facilities.  The Authority is not excused from performing
its obligation to pay when voters do not, in a particular election, approve the
sale of bond funds to pay appellees; its obligation
to pay simply does not arise at that time. 
That it may have appeared highly unlikely, at the time appellees entered to these contracts, that voters would not
approve a bond sale is no reason to rewrite the plain language of the
contracts.  This conclusion is further
supported by the fact that, under the contracts, the Authority was permitted to
lease the facilities until such time as it purchased them_a provision that demonstrates the parties contemplated
a continuing contractual relationship of an unspecified duration.[6]








Appellees contend that even if the receipt of
voter-approved bond funds is a condition precedent to payment, the Authority=s actions amount to a repudiation of
the contracts.  Specifically, appellees argue that (1) the trial testimony of Yoder and
Johnson amounts to a judicial admission that the Authority has no intention of
complying with the contracts, (2) voters authorized bonds to be sold to
reimburse University and Kirby Lake, and (3) the Authority had over $5 million
in surplus funds from voter-approved bond sales it could have used to pay appellees for their facilities.  First, while the statements of Yoder and
Johnson may reflect their individual beliefs, appellees
cite no authority to support their contention that these statements may be
attributed to the Authority, and the jury was charged that action by the
Authority requires a vote of at least a quorum of the directors in a public
meeting in compliance with the Open Meetings Act.  Second, the record shows that the voters
approved the sale of bonds for improvements within the Authority=s boundaries, not specifically to
University and Kirby Lake, as appellees contend.  Third, as we have held, while the Authority
could use other funds to pay for appellees= facilities, it was not obligated to
do so with any funds other than those from a voter-approved bond sale for that
purpose; there was no obligation that the Authority use funds from previous
bond sales.

(c)       Appellees= evidence of breach

Appellees place great emphasis on the
following provision in the contracts, which appellees
call the Adue diligence@ requirement:

ISSUANCE OF BONDS:  The Authority shall have no obligation to
obtain approval from the voters of bonds to finance purchase of the Facilities,
but if such voter approval is obtained, the Authority shall sell Authority
bonds for the purpose of purchasing the Facilities.  The Authority agrees to commence to obtain
approval by the [Texas Natural Resource Conservation] Commission of the bonds
to finance purchase of the facilities upon the successful passage of a bond
election subsequent to the effective date of this Agreement, but subject to the
right of the Authority to reasonably and efficiently integrate any and all
other eligible Authority projects in such sale. 
The Authority agrees to proceed with due diligence to consummate the
issuance of such bonds and the acquisition of the Facilities under such
circumstances.

According to appellees, the Authority breached
its Adue diligence@ obligation by drawing the public=s attention to a misleading
distinction between system needs and developer Asubsidies,@ opposing the bond propositions, and
separating the propositions for developer reimbursements from the proposition
for system needs, which caused the bond elections to fail.  Appellees also
contend these actions constituted a violation of the Authority=s ethical duties.  We disagree. 









As an initial matter, it is plain that the provision imposes
no obligation on the Authority to obtain voter approval:  Athe Authority is not obligated to
obtain approval from the voters of bonds to finance the purchase of facilities
. . . .@ 
The remainder of the sentence also makes clear that this provision does
not apply until such time as voter approval is obtained:  Abut if voter approval is
obtained, then it shall seek Commission approval of the bonds, and shall
proceed with due diligence to consummate the issuance of the bonds and
acquisition of the facilities@ (emphasis added).  The
remainder of the paragraph details the Authority=s obligations Aupon the successful passage of a bond
election.@ 
We do not interpret this provision to require the Authority to proceed
with due diligence to obtain voter approval. 
Even if the provision could be read as appellees
suggest, Yoder=s actions, such as distributing
memorandums in her neighborhood, publicly opposing the structure of the
propositions, and referring to the reimbursements as Asubsidies,@ are not
official acts of the Authority.  Webster
v. Texas & Pac. Motor Transp. Co., 140 Tex.
131, 134B35, 166 S.W.2d 75, 76B77 (1942) (holding that individual
members acting separately and not in a public meeting do not bind the board of
a governmental entity); King v. Guerra, 1 S.W.2d 373, (Tex. Civ. App.CSan Antonio 1927, writ ref=d) (same); see also City of Corpus
Christi v. Bayfront Assoc., Ltd., 814 S.W.2d 98,
105B06 (Tex. App.CCorpus Christi 1991, writ denied)
(inappropriate statements by city council member on city stationery were not
binding on city).  Appellees
cite no contradictory authority.  

Appellees also point to the Authority=s Aofficial acts@ of issuing official newsletters
which, appellees contend, signaled the voters to vote
against the propositions, and separating the propositions in the October 1998
elections.  However, appellees
identify nothing in the newsletters that indicated that the Authority was
advising voters to vote against the bond proposition for developer reimbursements.  We also find no language in the contracts to
support the contention that separating the propositions was a breach of
contract.  The contracts contain no
requirement that the ballot language be structured in any particular way; all
that was required was that the developers be included
in any subsequent election, and they were.[7]  

Appellees similarly argue the Aconsents and approvals@ paragraph that appears in each of
the contracts obligated the Authority not to unreasonably withhold its consent
or approval to use other available funds to pay appellees.  This paragraph, which appears toward the end
of the contracts along with other miscellaneous provisions, provides as
follows:








CONSENTS AND
APPROVALS.  Whenever the consent or approval of either party hereto, or
of any engineer of [sic] agent therefore, shall be required under the
provisions hereof, such consent or approval shall not be unreasonably withheld.


We disagree with appellees= interpretation of this
provision.  The payment provisions
contain no language that the Authority is required to Aconsent@ or give its Aapproval@ to make this provision applicable.[8]  Moreover, appellees= interpretation conflicts with the
express acknowledgment in the contracts that the Authority Ashall have the right to purchase the
Facilities with funds available from a source other than a bond sale for such
purpose, but shall have no obligation to do so.@ 
We cannot agree that this general provision trumps the express language
of the payment provisions. 

Therefore, we hold that the Kirby Lake, Miter, and Taylor Lake
contracts unambiguously
require the receipt of legally available and allocated voter-approved bond
funds as a condition precedent to reimbursement.  We further hold that the actions of Yoder and
the other Authority board members in connection with the bond elections, the
statements of Yoder and Johnson at trial, and the wording of the bond
propositions in May and October of 1998 do not constitute a breach of the
contracts as a matter of law. 

(d)       The
University contract

The University contract, however, is different.  Unlike the other contracts, the University
contract expressly acknowledges, in the first whereas clause, the 1989 bond
election in which the voters approved the issuance of $43.6 million in bonds:[9]








WHEREAS, the Authority is authorized
to provide, among other things, water supply, waste disposal, and drainage
facilities to the land within its boundaries and held a bond election on
October 14, 1989 at which the voters authorized the issuance of $43.6 million
in bonds for those purposes;

The second and third whereas clauses provide as follows:  

WHEREAS, the Authority desires that such facilities be
provided prior to the sale of its bonds to pay therefor,
because the interim growth of taxable values in the Authority should make such
bonds saleable upon better terms and will permit the Authority to meet more
easily debt service requirements on such bonds and because timely construction
of such facilities will prevent further escalation of construction costs; 

WHEREAS, the Authority desires that
such facilities be provided prior to the sale of its bonds to pay therefor, because the interim growth of taxable values in
the Authority should make such bonds saleable upon better terms and will permit
the Authority to meet more easily debt service requirements on such bonds and
because timely construction of such facilities will prevent further escalation
of construction costs;

The University contract also contains additional language not found in
the payment provisions of the other contracts, which is indicated by added
italics:

Section 2.01. 
PURCHASE AND ASSIGNMENT. 
Subject to the other terms and provisions hereof, the Developer agrees
to sell and the Authority agrees to purchase all completed portions of the
Facilities . . . as soon as possible, but not more than 30 days after receipt
of bond proceeds, or other funds not required for the payment of operating
and maintenance expenses or the payment of debt service on any bonds of the
Authority, legally available and allocated by the Authority for payment therefor, in consideration of the purchase price in the
following Section.








This section does not contain the express acknowledgments and Ano obligation@ language found in the other
contracts.  Appellees
do not address whether the contract is ambiguous, but they interpret this
provision to mean that the Authority agreed to purchase the facilities as soon
as possible from any available source of funds. 
We disagree with appellees= interpretation and find that the
University contract is ambiguous.  

The first whereas clause of the University contract
specifically acknowledges that voters authorized the issuance of $43.6 million
in bonds for the purpose of the development of water supply, waste disposal,
and drainage facilities on land within the Authority, including the land later
purchased by University.  In the second
and third whereas clauses, the parties acknowledge that the development of the
facilities prior to the time the Authority can pay for them with bond proceeds
is desired and advantageous to both parties. 
The bonds referred to in the second and third whereas clauses refer back
to the bonds authorized by the voters in the first whereas clause.  Therefore, the contract appears to
contemplate that University was to be paid with voter-approved bond funds.[10]  

Other provisions in the University contract similarly
demonstrate that such bond funds were the intended source of payment.  In the APurchase Price@ section, the Authority agreed to pay
an amount equal to specified costs of the developer, plus interest based on the
interest rate Aborne by the Authority=s bonds issued to reimburse the
Developer for these amounts . . ..@ In the next section, the Authority
agreed to Aproceed with due diligence@ to obtain the Commission=s approval of a bond offering to
finance the purchase of University=s contemplated facilities.  In a separate section, the timing of
University=s obligation to build street
improvements is tied to the Authority=s Adelivery of its bonds issued to
finance the acquisition and construction of the Facilities.@ 
Similarly, the developer agrees to provide a letter of credit to cover
the cost of street improvements unless the street improvements are completed by
the date the Authority advertises Athe sale of its bonds issued to
finance acquisition and construction of the Facilities.@ 









Moreover, evidence of the circumstances surrounding the
execution of the contract support the construction that the facilities were to
be paid for with voter-approved bond funds. 
The minutes of the October 14, 1993 board of directors
meeting of the Authority reflects that the board approved University=s project Ato
be funded with bond funds.@ 
In a follow-up letter to University=s principal, George Kawaja, from the Authority=s general manager, Wilbert Molbert, Kawaja was informed that
the Authority had agreed to participate in the construction costs for the
proposed water, sewer, and drainage facilities for the project Ain accordance with the Authority=s developmental policies.@ 
Kawaja also was informed that the Authority=s contribution was to be financed Aby a future bond sale if adequate
bonding authorization is available (such authorization is presently limited) or
would be included in a future bond authorization election that would require
voter approval.@  Kawaja testifed
that he understood that he was to be paid as described in Molbert=s letter.  

However, as noted above, the APurchase and Assignment@ section provides that the Authority
agrees to pay for the facilities with either bond proceeds or Aother funds not required for the
payment of operating and maintenance expenses or the payment of debt service on
any bonds of the Authority.@  Additionally, in the APurchase Price@ section=s provision for the payment of
interest, the parties agree to a formula for the calculation of the interest, Aprovided, however, that if such purchase price is
paid in whole or in part from proceeds of bonds of the Authority, such
purchase price or part thereof shall be subject to the Rules and
applicable orders of the Commission, and the Development Policies of the
Authority then in effect@ (emphasis added). 
This language further suggests that an alternate, or additional, source
of funding was contemplated.  Moreover,
unlike the other contracts, the University contract does not contain the
express language that the Authority may, but is not obligated to, pay for the
facilities with funds other than bond funds. 









Nevertheless, the extent to which the Aother funds@ language may apply is unclear.  It does not appear to encompass a complete
alternative to payment with bond proceeds, because the references to bond funds
throughout the contract indicate that such funds were intended to be at least a
primary source of funding.  Additionally,
there is no alternative language for those provisions of the contract that are
tied to the issuance or sale of bonds, with the exception of the calculation of
interest.  Consequently, the University
contract is susceptible to two competing interpretations:  the facilities are to be paid for with
voter-approved bond funds; or, the facilities are to be paid for with either
voter-approved bond funds or the Aother funds@ specified.  Therefore, we find that the payment language
of the University contract, in contrast to the other contracts discussed above,
is ambiguous.  

Having found that the University contract is ambiguous, we
must next address the Authority=s arguments that any interpretation of the contracts must be
harmonized with certain Aspecial considerations@ applicable to government contracts,
or else the contracts will be rendered void. 
As an initial matter, the Authority argues that, as a governmental
entity, it has legislative discretion to allocate public bond funds for the
benefit of the public, and the courts have no authority to interfere unless the
governing body has acted illegally or abused its substantial discretion.  See Barrington v. Cokinos,
338 S.W.2d 133, 142B43 (Tex. 1960); Inverness Forest Improvement Dist. v.
Hardy Street Investors, 541 S.W.2d 454, 460 (Tex. Civ.
App.CHouston [1st Dist.] 1976, writ ref=d n.r.e.).  However, once the Authority exercises its
discretion to enter into a valid and enforceable contract, it no longer has
unfettered Alegislative discretion@ to decide what its obligations are
and how it will perform those obligations. 
Whether
the contracts here are enforceable and whether the Authority breached them is
subject to review by the courts.  See,
e.g., Winograd v. Clear Lake City Water Auth.,
811 S.W.2d 147 (Tex. App.CHouston [1st Dist.] 1991, writ
denied) (affirming judgment against Authority on jury verdict finding breach of
contract and denial of due process and equal protection); Clear Lake City
Water Auth. v. Clear Lake Utils. Co., 549 S.W.2d
385 (Tex. 1977) (construing Authority=s obligations under a
contract); see also Tex. Water
Code ' 49.066(a) (Adistrict may sue and be sued in
the courts of this state@).  








The Authority also contends that the contracts must be
construed to allow it to decide whether and how it will pay because the
Authority cannot surrender its legislative discretion to decide whether and how
to allocate public funds.  In essence,
the Authority argues a Afuture board@ of the Authority cannot be
required to allocate funds for developer reimbursement.  In support of this assertion, the Authority
cites a single case, Marco Dev. Corp. v. City of Cedar Falls, 473 N.W.2d
41 (Iowa 1991).  In Marco Development,
the court refused to enforce the city=s agreement to widen a street
next to the developer=s mall project because it found
that the city could not contract for the performance of its governmental
functions.  See id. at 42B43.  We find Marco Development inapplicable
because here the Authority has only agreed to pay for facilities; the fact that
the payment is to be Aallocated@ for that purpose does not, in
this circumstance, impermissibly restrict its ability to undertake its
governmental functions.  Indeed, the
Authority is authorized by statute to contract for the joint construction,
financing, ownership, and operation of water and drainage facilities,
and such contracts may be of unlimited duration.  See Tex.
Water Code '' 49.211, 213(a) & 49.213(c)(4).  Nothing in the
statutes governing the Authority limits its ability to pay its contractual
obligations, and Texas courts have routinely enforced contracts requiring water
districts to pay in the future.  See, e.g., Quincy Lee Co. v. Lodal
& Bain Eng=rs, Inc., 602 S.W.2d 262, 264 (Tex. 1980); Harris
County Mun. Util. Dist. No. 48 v.
Mitchell, 915 S.W.2d 859 (Tex. App.CHouston [1st Dist.] 1995, writ
denied); City of Houston v. Moody, 572 S.W.2d 13 (Tex. App.CHouston [1st Dist.] 1978, writ
ref=d n.r.e.);
Brady v. Hidalgo County Water Control & Improvement Dist. No. 12, 56
S.W.2d 298 (Tex. Civ. App.CSan Antonio 1932), aff=d, 91 S.W.2d 1058 (Tex. 1936).[11]








The Authority also argues that the Texas Constitution
directly limits the power of water districts to incur debt.  See Tex.
Const. art.
XVI, '
59(c).  Article XVI, section 59(c)
provides in part that A[t]he Legislature shall authorize all such indebtedness as
may be necessary to provide all improvements and the maintenance thereof
requisite to the achievement of the purposes of this amendment.@ 
See id.  The only
limitation on that indebtedness is the requirement of voter approval for
indebtedness to be paid by taxes.  See
id.; Lower Colorado River Auth. v. McCraw, 125
Tex. 268, 274, 83 S.W.2d 629, 633 (1935); City of Houston v. Moody, 572
S.W.2d 13, 15B16 (Tex. App.CHouston [1st Dist.] 1979, writ ref=d n.r.e.).  The Authority cites no case law applying
this constitutional provision to invalidate or limit a water district=s contract in analogous
circumstances.

In summary, we hold that the University contract is
ambiguous, and we reject
the Authority=s arguments that our
construction of the contract violates constitutional principles or
impermissibly impinges on its governmental or legislative functions.  However, as discussed in the next section, we
find the trial court erred in submitting a single liability question
incorporating an invalid theory of recovery. 
Accordingly, we reverse the trial court=s judgment in favor of
University and remand for trial.[12]

B.      Casteel
Charge Error

The Authority next contends that there is Casteel error
in the broad-form submission of the breach of contract liability question,
because it cannot be determined whether the jury applied an invalid theory to
find a breach.  For the same reason, the
Authority asserts the damages question is defective.  Specifically, the Authority contends that the
developers alleged three theories of breach of contract in their pleadings, and
that all three are invalid: (1) breach of the pay provision, (2) the Aprevention doctrine,@ and (3) the Asplit format@ theory.  As to the first of theseCbreach of the pay provisionCwe have determined that
University=s breach of contract claim was
properly before the jury.  However, we
agree with the Authority that the other breach of contract theories were
invalid and should not have been considered by the jury as a basis for breach
of contract.  Because we cannot determine
from the jury=s answers the basis for their
finding that the Authority failed to comply with its contracts, we find that
the error is harmful, and we reverse and remand University=s claims for trial.  








Here, the trial court submitted a single question on
liability under the contracts, which  asked the jury the following: ADid the Water Authority fail to
comply with the sales agreements, if any, entered into with the respective
Plaintiffs?@[13]  Beneath the question was a line for each
developer in which the jury was to answer Ayes@ or Ano.@  At the charge conference, the Authority
timely and specifically objected to the question on the grounds now
raised.  The jury answered Ayes@ for each appellee,
except as to the 1998 Taylor Lake contract.








As stated above, the two theories we find invalid are, as
referred to by the Authority, the Aprevention doctrine@ and the Asplit format@ theory.  The Aprevention doctrine@ refers to actions of certain
members of the Authority=s board during the May and
October 1998 bond elections because the developers allege that those actions
prevented the passage of the bond proposals that would have authorized the sale
of additional bonds to pay them.  The Asplit format theory@ refers to the developers= argument that the Authority=s decision to split the bond
propositions in the October 1998 bond election into one for developer
reimbursements and one for water system necessities caused the bond proposition
for developer reimbursements to fail. 
Both were specifically alleged in appellees= petition as bases for breach
of contract.  As we have already
discussed in section I.A.(1)(c) above, we do not find
either the prevention doctrine or the split format theory to be a valid basis
for breach of contract in this case. 
Under Crown Life Insurance Co. v. Casteel, 22 S.W.3d 378 (Tex.
2000), Awhen a single broad-form
liability question erroneously commingles valid and invalid liability theories
and the appellant=s objection is timely and
specific, the error is harmful when it cannot be determined whether the
improperly submitted theories formed the sole basis for the jury=s finding.@  Id. at 389.  Here, we are unable to determine whether the
jury based its conclusion on the actions of Yoder or other board members in
opposing the bond propositions for developer reimbursement, or on the Authority=s decision to split the bond
propositions, or something else.  The
problem is compounded by the trial court=s instruction to the jury to
interpret the contracts without specifying which provisions they were to
interpret.  Therefore, we must conclude
that the error was harmful, and reverse and remand University=s claims for new trial. 

II.       Appellees= Alternative Grounds for
Recovery

A.        Quantum Meruit

Alternatively, appellees argue that
they should be allowed to recover on their quantum meruit
claim.  Quantum meruit
is an equitable remedy which does not arise out of a contract, but is
independent of it.  Vortt Exploration Co. v.
Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990).  To recover under quantum meruit,
a claimant must prove that: (1) valuable services were rendered or materials
furnished; (2) for the person sought to be charged; (3) which services and materials
were accepted by the person sought to be charged, used and enjoyed by him; (4)
under such circumstances as reasonably notified the person sought to be charged
that the plaintiff in performing such services was expecting to be paid by the
person sought to be charged.  Id. 

Appellants first contend that they are entitled to recover on
quantum meruit because liability was judicially
admitted by the Authority=s counsel in closing argument.  Appellants point to the statements by the
Authority=s counsel during his discussion of
the jury charge, when he said that the jury question on quantum meruit liability should be answered Ayes@ and told the jury that, as to
whether appellees provided compensable work to the
Authority, AOf course.  We=ve never disputed that.  This issue isn=t
whether the private developers did something of value.  The issue is when and how they ought to be
paid.@ 
Appellees also point to the Authority=s counsel=s arguments to the jury that they
should not award more than the 70% figure calculated by appellees= expert, and requesting that the jury
award that amount as the reasonable value of the compensable work performed by
the plaintiffs.  We have reviewed the
record and find that the statements of the Authority=s counsel  do not constitute a judicial
admission.








A judicial admission must be clear, deliberate, and
unequivocal.  Regency Advantage Ltd. P=ship v. Bingo Idea-Watauga, Inc., 936 S.W.2d 275, 278 (Tex.
1996).  During closing argument, the
Authority=s counsel began his discussion of the
jury question on quantum meruit liability by stating
that Athis one should not be applicable.@ 
He went on to argue that whether appellees did
something of value was undisputed_what was at issue was whether they
had contractually agreed to be paid for that work when the voters approved
payment from bond proceeds:

This issue isn=t whether the private developers did something of
value.  The issue is how and when they ought to be
paid.

Question three should be answered
yes.  They were going to be paid 70
percent of their reimbursable expenses out of voter-approved bond funds.  That=s
an easy one.  They may still be
paid, if, as and when a future election authorizes the use of funds to pay
them.  And as the Court told you, this is
an unlimited duration contract.

The Authority=s counsel also addressed the question of quantum meruit damages by arguing that under the contracts, the
developers were only going to get reimbursed 70% of the cost of the facilities,
and therefore they should not be compensated for the reasonable value of their
services in an amount greater than the amount they would have received under
the contracts.

We do not find the Authority=s statements to be a Aclear, deliberate, and unequivocal@ admission of quantum meruit liability.  It
is evident from the context that counsel was arguing that quantum meruit was not applicable, but if the jury was going to
answer it in favor of appellees, they should award no
more than the amount they agreed to be paid under the contracts.  Even if counsel=s statement that it was Aundisputed@ that appellees
Adid something of value@ were construed as an admission, at
most it addresses only the first of the four necessary elements of quantum meruit.  Therefore,
we reject appellees= argument that the Authority
judicially admitted liability in quantum meruit.








Appellees next argue that they satisfy the
elements of quantum meruit because the Authority has
accepted the facilities and is using them to provide water and sewer services
to customers within its boundaries in accordance with its statutory duties, and
it was reasonably notified that appellees expected
payment for the facilities.  However,
recovery in quantum meruit is generally not available
when there is an express contract covering the services or materials
furnished.  See Vortt,
787 S.W.2d at 944. 
In their brief, appellees mention that the
existence of an express contract will not defeat a recovery in quantum meruit when the contract is deemed invalid, abandoned, or
if it is partially performed without the fault of the party seeking to recover
in quantum meruit, citing W & W Oil Co. v.
Capps, 784 S.W.2d 536, 537B38 (Tex. App.CTyler 1990, no writ), and Angroson,
Inc. v. Independent Communications, Inc., 711 S.W.2d 268, 271B72 (Tex. App.CDallas 1986, writ ref=d n.r.e.),
but they do not argue that any of these exceptions are applicable to them.  In any event, we do not find the stated
exceptions applicable to the facts of this case; therefore, we hold that the
existence of express contracts prohibits appellees
from recovering on the alternative ground of quantum meruit.   

B.        Declaratory
Judgment








Appellees also argue that the trial court=s declaratory judgment is an
alternative ground for the judgment which the Authority did not appeal.  Appellees refer to
that part of the reformed final judgment in which the trial court ordered that APursuant to Chapter 37 of Tex. Civ. Prac. & Rem Code, the
Clear Lake City Water Authority is obligated under its contract with Plaintiffs
to purchase Plaintiffs= sewer, water, and drainage Facilities and its Board of
Directors shall take any and all actions required to purchase the Facilities.@ 
Appellees contend that the Authority did not
raise any challenge in its brief to this declaration, and any complaint about
it is therefore waived.  They also
contend that the Authority judicially admitted what a reasonable price for the
facilities would be.  For this assertion,
appellees again rely on the Authority=s counsel=s closing remarks about the
reasonable value of the compensable work performed by the plaintiffs in his statements
to the jury regarding their answer to the quantum meruit
damages question discussed above. 
However, a declaratory judgment action is not necessarily an action for
affirmative relief.  See
Republic Ins. Co. v. Davis, 856 S.W.2d 158, 164 (Tex. 1993).  The relief provided under the Declaratory
Judgments Act is remedial only, and it serves only A>to settle and to afford relief from
uncertainty and insecurity with respect to rights, status, and other legal
relations.=@  Id. (citing Tex. Civ. Prac. & Rem. Code ' 37.002(b)).  Here, the Authority has requested that we reverse
Athe judgment,@ which subsumes the declaratory
judgment, because appellees= contract claims are infirm.  The viability of the trial court=s declaration is wholly dependent
upon the existence of the contract liability the Authority challenges.  Because we have found the Authority is not
liable under its contracts with appellees, the relief
granted pursuant to the Act cannot be sustained.  Therefore, we hold that the trial court=s declaration does not constitute an
alternative ground upon which to sustain the judgment.

III.       Appellees= Cross-Point on Their Takings Claim

In a single cross-point, appellees
contend the trial court erred in granting the Authority=s directed verdict on their claim
that the Authority=s use and control of the facilities constitutes a taking of appellees= property without compensation in violation of Article I,
Section 17 of the Texas Constitution.  To
recover under a theory that property has been taken by a governmental entity
without adequate compensation, a plaintiff must establish the following: (1)
that the government entity intentionally performed certain acts; (2) that
resulted in the taking of the property; (3) for public use.  Gen. Servs. Comm=n v. Little-Tex Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001); Loyd v. Eco Res., Inc., 956 S.W.2d 110, 128 (Tex. App.CHouston [14th Dist.] 1997, no writ).  Property is taken for a public use only when
there results to the public some definite right or use in the undertaking.  Loyd, 956 S.W.2d at 128. 
Whether particular facts are enough to constitute a taking is a question
of law.  Little-Tex Insulation, 39 S.W.3d at 598.  

Appellees argue that the evidence was
sufficient to submit the claim to the jury, because it showed that the
Authority, a governmental entity, took possession of appellees= facilities for public use to provide
residents of the district with water, sewer, and drainage services, but has
not, and said it will not, pay for the facilities.  However, a governmental entity does not have
the requisite intent under constitutional-takings jurisprudence when it 








withholds property or money from an entity in a contract dispute.  See Little-Tex, 39 S.W.3d at 598B99; see also Green Int=l, Inc. v. State, 877 S.W.2d 428, 434 (Tex. App.CAustin 1994, writ dism=d) (AEven if the government were to
withhold property or payment it believed to be due the other party, the
government would still be acting within the color of right to the extent it had
a good faith belief that its actions were justified due to disagreements over
payment due or performance under the contract.@). 
Here, the Authority disputed appellees= contention that it was obligated
under the contracts to pay appellees for their
facilities as soon as possible with any available funds; therefore, it lacks
the requisite intent.  Accordingly, we
overrule appellees= cross-point.

CONCLUSION

We hold that the Kirby Lake, Miter, and Taylor Lake contracts
unambiguously require the receipt of voter-approved bond funds as a condition
precedent to payment by the Authority; accordingly, we reverse and render
judgment in favor of the Authority against Kirby Lake, Miter, and Taylor
Lake.  We further hold that University=s breach of contract claims are
reversed and remanded for a new trial. 
We further hold that the trial court did not err in granting the
Authority=s motion for directed verdict on appellees= takings claim.

 

 

 

 

/s/        Leslie Brock Yates

Justice

 

 

Judgment rendered
and Opinion filed December 9, 2003.

Panel consists of
Justice Yates and Justice Hudson.  Former
Chief Justice Scott Brister not participating.











[1]  Kirby Lake,
Miter and University each entered into one contract with the Authority.  Taylor Lake  entered into two contracts with the
Authority, one in 1994 and one in 1998, because the Authority was not
immediately able to annex a portion of the property Taylor Lake sought to
develop. 





[2]  Apparently,
the signs also included a date that was taped over for use in the later bond
election held in October 1998.





[3]  The jury found
that the Authority failed to comply with each of the contracts except the 1998
Taylor Lake contract, and did not award damages for that contract.  Taylor Lake does not appeal this finding.





[4]  In addition to
revenue bonds, appellees contend that the Authority
could pay with surplus funds from the sale of ad valorem
tax bonds or cash on hand.





[5]  The bold and
italicized portions are reproduced as they appear in the Kirby Lake and Miter
contracts.  The provision in the 1994
Taylor Lake contract consists of uniform characters without emphasis.  The 1994 Taylor Lake contract also specifies
that AThe Authority intends to call a bond election in March
or May of 1994@ instead of Ain the
near future.@





[6]  The Authority,
in addition to arguing that the receipt of voter-approved bond funds is a
condition precedent to payment under the contracts, also contended that the
language in the payment provision of the contracts that the funds must be Alegally available@
likewise constituted a condition precedent to payment.  Because no funds became Alegally available@ for
payment, the Authority urges, the condition precedent was not fulfilled and
there can be no breach of contract. 
However, we do not find the phrase Alegally
available@ in the context of the payment provisions to
constitute a condition precedent.  At
most, it simply recognizes the manner and mechanism by which the Authority
would authorize the expenditures. 





[7]  The Authority
also argues, as additional support for its contention that it did not breach
the contracts by refusing to combine the bond elections, that
the October 1998 election was outside the scope of the Kirby Lake, Miter, and
Taylor Lake contracts because it was only required to include a proposition for
developer reimbursements in one election. 
We express no opinion on the Authority=s
interpretation of the provision, as appellees make no
argument in response and neither party raises this interpretation of the
provision as an issue.





[8]  In contrast,
other provisions of the contracts expressly incorporate this provision.  For example, section 1.01 of the University
contract, dealing with construction of the facilities, provides A[a]ny and all Contracts or
change orders to the Contracts shall be subject to approval by the board of
Directors of the Authority (the ABoard@) (which approval shall not be unreasonably withheld).@  Likewise, in
section 4.01, dealing with the construction of street improvements, the
developer agrees to complete and pay for street improvements in the subdivision
Aas described in the respective plats thereof (as the
same may hereafter be amended either without effect to the size or location of
such Street Improvements or with the consent of the Authority) in accordance
with the plans and specifications therefor approved
by the engineers for the Authority, which approval shall not unreasonably be
withheld . . . .@





[9]  Appellees also contend the area that became the subject of
the Kirby Lake contract was included in the 1989 bond election, but there is no
reference to the bond election in the Kirby Lake contract, which was executed
in July of 1997, as there is in the University contract.  Moreover, Kirby Lake did not enter into its
contract with the Authority until after all the 1989 bond proceeds had been
spent or allocated for other purposes. 
As reflected in the minutes of the public meeting in which the Authority
voted to authorize the contract with Kirby Lake, Jack Beard, Kirby Lake=s principal, and the Authority stipulated to the
following:

 

Developer
reimbursements are strictly subject to the availability of appropriate bond
funds.  At this time the Authority and
the Developer, Kirby Lake Development, Inc. acknowledge that such funds are not
available and that the availability of such funds is subject to voter approval.





[10]  Sections 1 and
2 of the University development were ultimately included in a 1997 bond sale,
and University was paid for those sections out of those proceeds.  Sections 3 and 4 were put on the May 1998
ballot, but the proposition failed, and University was not paid for those
sections.





[11]  In connection
with this issue, the Authority argues that because the Texas Constitution
limits the legislature=s discretion to create debt, see Tex. Const. art. III, '' 44, 49a, 50; art. IV, '14; art.
VIII, ' 6, the Authority, as a creation of the legislature,
is similarly limited and therefore cannot bind Afuture
boards@  of the
Authority to allocate funds to pay for the facilities.  We are unpersuaded
that the constitutional limitations on legislative
appropriations is applicable here, and the Authority cites no case law
in which these limitations were applied to a water district=s contractual obligations.  Similarly, the Authority argues that any
interpretation of the contract that implies a requirement to appropriate future
public funds, when no such requirement clearly and unmistakably appears on the
face of the contract, violates the constitutional requirement of separation of
powers.  Again, we disagree that the
contractual agreement to pay a portion of the cost of the facilities in these
contracts impinges on the Authority=s
governmental functions.





[12]  Because of our
disposition of the case, we do not reach the Authority=s argument that there was legally and factually
insufficient evidence of developer interest, which was part of the damages
award.





[13]  The question also included this
instruction: AIt is your duty to interpret the
meaning of the written agreements of the parties in this case.  To interpret each agreement, you must
consider, in addition to the language in the agreements, the facts and
circumstances surrounding the making of the agreement, the interpretation
placed on the agreement by the parties, and the conduct of the parties.@